[No. A119404. First Dist., Div. Five. Apr. 6, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RYAN BRIAN BUI, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and III.B.

**COUNSEL**

Riordan & Horgan, Dennis P. Riordan and Donald M. Horgan for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye, Stanley Helfman and John R. Vance, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BRUINIERS, J.**—Appellant Ryan Brian Bui (Bui) was convicted of two counts of burglary, one count of attempted burglary, and one count of receiving stolen property. He maintained his constitutional right to a public trial was violated by the trial court's temporary exclusion of family members from the courtroom during jury voir dire. Bui also claimed error in the court's exclusion of certain evidence offered in support of his defense theory of third party culpability. We found any error in exclusion of persons from the courtroom to be de minimis and affirmed. Bui petitioned for review. The California Supreme Court directed this court to vacate our prior decision and reconsider in light of *Presley v. Georgia* (2010) 558 U.S. ___ [175 L.Ed.2d 675, 130 S.Ct. 721] (*Presley*). In the published portion of this decision, we conclude that *Presley* does not alter the "de minimis" doctrine recognized by the California Supreme Court on which our prior decision relied. Accordingly, we affirm.

## I. PROCEDURAL BACKGROUND

The San Mateo County District Attorney charged Bui by information with two counts of burglary (Pen. Code, § 460, subd. (a)),[1] one count of attempted burglary (§§ 460, subd. (a), 664), and one count of receiving stolen property (§ 496, subd. (a)). The information also alleged that Bui was on parole at the

---

[1] All further undesignated statutory references are to the Penal Code.

time he committed the last offense, and that he had a prior conviction for one count of residential burglary in San Francisco, and a San Mateo prior conviction for five counts of residential burglary. These prior convictions were alleged as strikes under section 1170.12, subdivision (c)(2), and enhancements under sections 667.5, subdivision (b), and 667, subdivision (a).

A jury found Bui guilty of all four counts, and found all the enhancing allegations to be true. Bui moved for a new trial on the basis of denial of his right to public trial and exclusion of third party culpability evidence. The trial court denied the motion. The court sentenced Bui to 25 years to life on the first count of burglary, and to a consecutive determinate term of 21 years eight months on the remaining counts.

We affirmed the conviction in an unpublished decision on October 7, 2009. Bui filed a petition for reconsideration and a petition for writ of habeas corpus, which we also denied. On February 3, 2010, the California Supreme Court granted his petition for review and ordered this court to vacate its decision and reconsider the cause in light of *Presley, supra*, 558 U.S. ___ [130 S.Ct. 721].

## II. FACTUAL BACKGROUND[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISCUSSION

### A. *Exclusion of Family Members from Voir Dire*

Bui argues that he was denied his Sixth Amendment right to a public trial because three spectators, including two family members,[3] were excluded from the courtroom for about 40 minutes during jury voir dire.[4] He maintains that this constituted structural error, requiring reversal of his conviction without the necessity of any showing of prejudice.

---

[*]See footnote, *ante*, page 675.

[3] The trial record is not entirely clear on the spectators' identities, but they are described in Bui's motion for new trial as his "mother, his aunt (who was visiting from Vietnam) and a person not related to the defendant, Lily Wong." On October 22, 2009, Bui filed a petition for habeas corpus in this court (*In re Bui* (Oct. 30, 2009, A126478) [nonpub. order]) with declarations from four individuals (Trac Huynh, Cindy Wong, Lily Chow, Christine Huynh) who allege they were excluded from the courtroom.

[4] As discussed *post*, Bui disputes the duration of the exclusion, contending that his family members left the courthouse and did not return until the "following day." Even if we assume this to be the case, the additional proceedings on that date consumed a total of 33 minutes before the court recessed for the day at noon—a period that does not affect our "de minimis" analysis. Second, as discussed in greater detail *post*, it is the time between the exclusion of individuals from the courtroom and the court's authorization for their return that we believe is the relevant consideration.

■ "Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times. (See U.S. Const., amends. VI, XIV; Cal. Const., art. I, § 15; see also . . . § 686, subd. 1.)" (*People v. Woodward* (1992) 4 Cal.4th 376, 382 [14 Cal.Rptr.2d 434, 841 P.2d 954] (*Woodward*).) A "defendant's state constitutional public trial right appears to be coextensive with the federal guarantee [citation] . . . ." (*Id.* at p. 381.) "Nearly a century ago this court declared in *People* v. *Hartman* (1894) 103 Cal. 242, 245 [37 P. 153] . . . : 'The doors of the courtroom are expected to be kept open, the public are entitled to be admitted, and the trial is to be public in all respects, . . . with due regard to the size of the courtroom, the conveniences of the court, the right to exclude objectionable characters and youth of tender years, and to do other things which may facilitate the proper conduct of the trial.' " (*Woodward, supra,* at p. 388 (conc. opn. of Mosk, J.), first ellipsis added.)

■ A trial open to the public "plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. [Citation.]" (*Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 508 [78 L.Ed.2d 629, 104 S.Ct. 819] (*Press-Enterprise*).) If a defendant has been denied his Sixth Amendment right to public trial, the error is structural in nature, and reversible per se. A "defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." (*Waller v. Georgia* (1984) 467 U.S. 39, 49 [81 L.Ed.2d 31, 104 S.Ct. 2210], fn. omitted (*Waller*).)

■ The public trial right applies not only to the trial itself, but also to a pretrial suppression hearing (*Waller, supra,* 467 U.S. at p. 48), preliminary examinations (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 526 [165 Cal.Rptr. 851, 612 P.2d 941]), closing arguments (*Woodward, supra,* 4 Cal.4th at p. 383), instructing the jury (*People v. Teitelbaum* (1958) 163 Cal.App.2d 184, 206–207 [329 P.2d 157]), and voir dire. (*Presley, supra,* 558 U.S. at p. ___ [130 S.Ct. at p. 724]; *Press-Enterprise, supra,* 464 U.S. at p. 508.) "The general trend of the cases appears to be toward *expanding* application of the public trial right." (*Woodward, supra,* 4 Cal.4th at p. 383.)

In some limited circumstances, however, the public may be barred from a criminal trial. "The Sixth Amendment public trial guarantee creates a 'presumption of openness' that can be rebutted only by a showing that exclusion

of the public was necessary to protect some 'higher value,' such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings. [Citation.]" (*Woodward, supra*, 4 Cal.4th at p. 383.) "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." (*Press-Enterprise, supra*, 464 U.S. at p. 510.)

Recently, the United States Supreme Court in *Presley*, in a *per curiam* opinion, reversed a criminal judgment where the trial court excluded members of the public from the courtroom during voir dire (in that case as here, including a member of the defendant's family) based on purported space limitations for accommodating prospective jurors, and from an expressed concern that jurors might overhear " 'inherently prejudicial remarks from observers during voir dire.' " (*Presley, supra*, 558 U.S. at pp. ___–___ [130 S.Ct. at pp. 722–723].) When Presley's counsel objected to " ' "the exclusion of the public from the courtroom," ' " the trial court explained, " ' "[t]here just isn't space for them to sit in the audience." ' " Presley's attorney then requested " ' "some accommodation," ' " but the court stated " ' "the uncle can certainly come back in once the trial starts. There's . . . really no need for the uncle to be present during jury selection . . . ." ' " (*Id.* at p. ___ [130 S.Ct. at p. 722].)

At a hearing on a postconviction motion for new trial, Presley presented evidence showing that the prospective jurors could have been accommodated in the courtroom, still leaving adequate room for the public. (*Presley, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 722].) The Georgia Supreme Court affirmed the conviction, finding that the trial court had an " 'overriding interest' " in ensuring that potential jurors heard no inherently prejudicial remarks from observers during voir dire, and rejecting Presley's argument that the trial court had a sua sponte duty to consider alternatives to closing the courtroom when none were offered by the defendant. (*Presley v. State* (2009) 285 Ga. 270 [674 S.E.2d 909, 911].) It held " 'the United States Supreme Court [has] not provide[d] clear guidance regarding whether a court must, sua sponte, advance its own alternatives to [closure],' [thus] . . . 'there is no abuse of discretion in the court's failure to sua sponte advance its own alternatives.' " (*Presley, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 723], final brackets added, citing *Presley v. State, supra*, 674 S.E.2d at p. 912.)

■ The United States Supreme Court disagreed and, although recognizing that there may be exceptions to the right of an accused to public voir dire, held that "trial courts are required to consider alternatives to closure even

when they are not offered by the parties" (*Presley, supra,* 558 U.S. at p. ___ [130 S.Ct. at p. 724]), and that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials" (*id.* at p. ___ [130 S.Ct. at p. 725]). It explained "[t]here are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire. But in those cases, the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Id.* at p. ___ [130 S.Ct. at p. 725], italics omitted, citing *Press-Enterprise, supra,* 464 U.S. at p. 510.)

In *Presley,* the Supreme Court reiterated the "settled" underpinnings of the public trial right under both the First Amendment (*Press-Enterprise*) and Sixth Amendment (*Waller*).[5] (*Presley, supra,* 558 U.S. at pp. ___–___ [130 S.Ct. at pp. 723–724].) As indicated by its summary *per curiam* disposition, we do not read *Presley* as defining any greater scope to the public trial right under either the First or Sixth Amendments than that already articulated in *Press-Enterprise* and *Waller.* Rather, the high court focused upon the failure of the trial court to follow the "explicit" directives of *Waller* that " '[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.' " (*Presley,* at p. ___ [130 S.Ct. at p. 724], brackets in original, citing *Waller, supra,* 467 U.S. at p. 48.) It was incumbent upon the trial court to consider all reasonable alternatives to closure. "It did not, and that is all this Court needs to decide." (558 U.S. at p. ___ [130 S.Ct. at p. 725].)

■ The California Supreme Court has recognized, however, that not every closure of a trial or exclusion of certain spectators, rises to the level of a constitutional violation, and that certain exclusions or closures are so "de minimis" that they do not violate a defendant's constitutional public trial rights. In *Woodward, supra,* 4 Cal.4th 376, the trial court directed that the courtroom doors be closed and locked during closing argument, and a sign placed on the courtroom door reading: " 'Trial in progress—Please do not enter . . . .' " Defense counsel observed the sign on returning from a recess and moved for a mistrial. The court denied the motion, explaining that "the courtroom was the situs of the probate department, where various counsel

---

[5] The court declined to decide the extent to which the scope of protections under one amendment might be greater than under the other. "The extent to which the First and Sixth Amendment public trial rights are coextensive is an open question, and it is not necessary here to speculate whether or in what circumstances the reach or protections of one might be greater than the other." (*Presley, supra,* 558 U.S. at p. ___ [130 S.Ct. at p. 724].)

seeking ex parte orders were apt to cause 'constant interruptions.' The bailiff had placed the sign 'sometime probably at lunch in order not to interrupt argument with the attorneys coming in and out.' " (*Woodward, supra*, 4 Cal.4th at p. 380.) The court agreed to take the sign down and unlock the courtroom doors. (*Ibid.*) The following day, the court stated that another reason for the temporary closure was that the trial posed unusual security risks. (*Ibid.*) The court indicated that the defendant was a " 'kickboxer' and had been classified both as a violent offender and an escape risk. . . . [His] alleged offenses involved drug transactions, and defendant had indicated to the bailiff that some persons in the courtroom might attempt to kill him." (*Ibid.*) Due to the number of people entering the courtroom in the morning, the bailiff asked to close the doors and direct persons to a room, "where they could be more readily screened before admittance to the courtroom. Due to a shortage of personnel, only a single bailiff was available to secure the courtroom." (*Ibid.*) The trial court indicated that " 'during the entire afternoon session there were in fact people in the audience in the courtroom, and . . . people were not prevented from coming in and being spectators.' " (*Ibid.*)

The *Woodward* court held that "the closure of the courtroom doors to additional spectators during part of the prosecutor's arguments, being both temporary in duration and motivated by legitimate concerns to maintain security and prevent continuous interruptions of closing arguments, and not involving the exclusion of preexisting spectators, did not constitute a denial of defendant's public trial right." (*Woodward, supra*, 4 Cal.4th at p. 381.) The Supreme Court noted that "the courtroom was never cleared to remove all spectators for a significant period." (*Id.* at p. 385.) Moreover, the trial court had "expressed substantial reasons justifying the temporary closure, namely, to maintain court security and orderly courtroom proceedings." (*Ibid.*) The *Woodward* court held that "the de minimis rationale . . . is more pertinent to the circumstances in this case, in which the closure did not exclude preexisting spectators, did not include any of the evidentiary phase of the trial and lasted only one and one-half hours." (*Id.* at pp. 385–386.) Accordingly, the court held that the "defendant had a public trial throughout the entire proceeding." (*Id.* at p. 385.)

In *People v. Esquibel* (2008) 166 Cal.App.4th 539 [82 Cal.Rptr.3d 803] (*Esquibel*), the trial court excluded two apparent friends of the appellant from the courtroom during the examination of a seven-year-old witness in a gang-related shooting case because of concerns about retaliation. (*Id.* at pp. 546–547.) The Second District Court of Appeal there concluded that a "partial closure of a trial by the temporary exclusion of select supporters of the accused does not create an automatic violation of the constitutional right to a public trial. Furthermore, on the facts of this case, we conclude there was no constitutional violation of appellant's rights. To hold otherwise would not

serve the purposes of the public trial right." (*Id.* at p. 554, cert. den. *sub nom.* *Esquibel v. California* (2009) ___ U.S. ___ [173 L.Ed.2d 1097, 129 S.Ct. 1998].)

Numerous federal courts have also recognized a "de minimis" or "triviality" exception. (See, e.g., *Braun v. Powell* (7th Cir. 2000) 227 F.3d 908, 919–920 [exclusion of one spectator from entire trial "does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial"]; *Peterson v. Williams* (2d Cir. 1996) 85 F.3d 39, 40–41 ("even an unjustified closure may, on its facts, be so trivial as not to violate the [Sixth Amendment]").) More recently, in *Gibbons v. Savage* (2d Cir. 2009) 555 F.3d 112, a federal habeas corpus proceeding, the defendant's mother was improperly excluded from an entire afternoon of voir dire out of concern by the trial judge that her proximity to jurors in a small courtroom could " 'taint the entire jury pool.' " (*Id.* at pp. 114, 119.) Even though the closure was not justified under the standards of *Waller,* the court concluded that "upon examination of all the details of what occurred, that event was too trivial to warrant the remedy of nullifying an otherwise properly conducted state court criminal trial." (*Id.* at p. 121.) The court went on to observe: "We need not rule on the metaphysical question whether, in view of the triviality of the incident, it was not a deprivation of a constitutional right, or in contrast, it was a violation of a constitutional right, but, in spite of the inapplicability of the harmless error rule, too trivial to justify vacating the state court's judgment." (*Ibid.*)

We first consider whether the claimed error was a denial of the defendant's right to public trial, and only if that answer is in the affirmative do we continue to an analysis under *Presley* of whether the trial court considered alternatives to closure.

In order to analyze whether Bui was denied his right to a public trial, we set forth the facts surrounding the claimed denial in some detail. The matter was assigned to trial on June 5, 2007. On June 6, 2007, after unreported chambers conferences, a jury panel was summoned at 9:55 a.m. and jury selection commenced, concluding at 4:45 p.m. on that date. On June 7, 2007, following another unreported chambers conference, the prospective jurors returned to the courtroom at 10:05 a.m. During the court's morning recess, at 11:00 a.m., the court and counsel placed on the record a sidebar discussion concerning a juror hardship excuse and challenges for cause by the defense.[6]

---

[6] The record does not indicate the actual time of the sidebar conference, which appears to have occurred, based on the number of transcript pages, slightly more than halfway through the morning session. The court asked counsel to come to the bench, and later indicated that it would put the discussion on the record at the break. There is no indication that the court was actually aware of the bailiff's removal of Bui's family before counsel brought it to her attention at sidebar.

The court stated that it was denying a motion, apparently made by the defense at sidebar, to strike the venire and to start again with a new panel.

Bui's attorney then indicated he had "another motion . . . . [¶] . . . [¶] [A]t approximately 10:20, Mr. Bui's family came in and I noticed they arrived and they sat in the row, I think the second row together as much as they could. There were many empty seats at that point although the potential jurors were also seated in the body of the courtroom. I noticed that the bailiff removed them from the courtroom and they have been removed from the courtroom since. It is now 11:05. [¶] At the bench, the Court informed me that it is the Court's policy not to let members of the family sit in the audience while voir dire is going on and jurors are being selected for fear that the family might say something inappropriate and taint the process. While I appreciate the Court's concern and certainly do not wish any tainting on this process, this is a public proceeding and Mr. Bui's family and Mr. Bui himself have the right to have a complete open and public process. And there are alternatives to the Court, for example, setting aside certain seats and sitting the jury in another section of the audience or admonishing the family. There are alternatives to summarily removing . . . the family from the courtroom during this proceeding, and for that reason, I would move that the panel be stricken and we start anew. . . . This is a public proceeding, and I don't believe the Court has the authority absent misconduct to remove anybody from viewing the proceeding." The court responded: ". . . I would agree with you that if I had been told that the family was going to be there or given any notice whatsoever, what I would [have] said to you is to admonish these people from not discussing anything in front of the prospective jurors, and we would [have] made provisions to have them sit that as best we could in a fashion that's segregated from the rest of the jurors, but they just showed up and there they were. I have to make these decisions at that moment, and I can't risk having potential jurors hearing conversation among the family, it would totally prejudice the panel, so I have to make these decisions quickly. And again, I wish it had not happened that way, but they're only excluded for a few minutes. I don't remember when they showed up, but you can certainly accommodate them after they have been admonished. I'm just not going to take that kind of chance."

The prosecutor interjected that, at the sidebar, she "heard the Court say to [Bui's attorney] and I, of course, quietly and the reporter wouldn't [have] taken it down. What I remember the Court saying is something like unless you want to admonish them, which I took to be an offer to [Bui's attorney] to stop the process and have him make the appropriate admonition to the family members." Bui's counsel responded: "Your honor, at the bailiff's request, I

actually did make an admonition to the family yesterday.[7] I did not hear the Court saying unless you want to admonish them, had I heard that I would have happily said yes, I'm happy that they be admonished and be allowed to remain in the courtroom. I did not hear that, and I don't believe it was spoken in my presence." The court responded: "I think I did say that, but you didn't respond so you may not have heard what I said. But I just wasn't given any heads up that these people were going to be here otherwise we would have discussed that issue and handled it in some fashion which we do all the time. It's not unusual, it's fairly typical to have family members watch a trial, we just need to kind of know these things so . . . we can handle them in one way or the other. So I don't think it's a great prejudice, the fact that they have been excluded from the courtroom for a few minutes, I mean literally so." Bui's attorney explained: "It has been a better part of an hour, and I'm not aware of any duty on the defense's part to inform the Court or anybody that members of the public are going to be witnessing the trial or any aspect." The court denied the motion to strike the jury panel, stating "It's not a member of the public . . . . I mean, you know as well as I do that people say things that they don't realize are being overheard by other people, that's my job to guarantee both sides a fair trial. So again, if I know these things are going to happen then I will deal with them appropriately, and hopefully fairly, but I have to deal with things as they happen. . . . [¶] . . . [¶] Well, they have been admonished; is that correct? [¶] [Bui's counsel]: I admonished them yesterday to make no comments and to have no communication with Mr. Bui. [¶] [Court]: Again, I didn't know that, we didn't have that discussion. [¶] All right. When they come back in, if you could have them seated somewhere that is not around the other jurors. I'm asking the bailiff to do that."

Jury selection resumed at 11:27 a.m. and the court recessed for the day at noon. On June 8, 2007, the court resumed voir dire at 9:27 a.m. and the jurors and alternates were impaneled by 9:47 a.m. The record is silent as to whether members of Bui's family attended on June 8.

There is no question here that three individuals were excluded from the voir dire examination for a period of roughly 40 minutes.[8] The issue before us is whether this exclusion was "de minimis" and so did not rise to the level of a constitutional violation. (*Woodward, supra,* 4 Cal.4th at pp. 379, 385.) Bui acknowledges the holding in *Woodward,* but argues that *Presley* now dictates a different result. But *Presley* did not consider or address, either

---

[7] This statement would imply that one or more of the family members had been present during voir dire on June 6, but the record is silent on this issue.

[8] The exclusion period would be a little over an hour—73 minutes—if we were to accept Bui's contention that the court's actions had the effect of excluding his family members for the balance of the proceedings on June 7, 2007.

expressly or implicitly, the "de minimis rationale" or "triviality standard" recognized by both the California Supreme Court and several federal courts.

In considering the application of *Presley* to the facts before us, we observe first that in *Presley* the trial court confirmed its exclusionary policy in the face of the defendant's objection and conducted the entirety of the voir dire under that generalized policy, excluding *all* members of the public, without consideration of available alternatives, for the duration of that phase of the trial. Here the trial judge, immediately after the issue was raised by Bui's attorney, and upon counsel's assurance that the three family members had been appropriately admonished, instructed the bailiff to accommodate them in the courtroom. We do not believe that *Presley* obviates consideration of the "de minimis" nature of a courtroom closure, and therefore it does not answer the question we must decide.

Bui also cites *Owens v. U.S.* (1st Cir. 2007) 483 F.3d 48 (*Owens*). In that case the trial court had cleared the courtroom of members of the public, including two members of the defendant's family, to allow seating for the large jury panel required for the case.[9] (*Owens*, at pp. 54, 61.) The public was not readmitted, however, as seats became available, and as a result the public was excluded for an entire day of jury selection. (*Ibid.*) On review of denial of the defendant's habeas corpus petition, the court remanded for an evidentiary hearing to determine the nature and extent of the trial closure, noting that this "was not a mere fifteen or twenty-minute closure; rather, Owens' trial was allegedly closed to the public for an entire day while jury selection proceeded." (*Id.* at p. 63.) The court concluded that if the trial court barred spectators from the courtroom as the defendant alleged, he was denied his Sixth Amendment right to have a public trial and that he need not demonstrate prejudice.[10] (*Owens*, at pp. 63–64, 66.) *Owens* is distinguishable on its facts. Not only was voir dire in that case closed to the public for an *entire* day, but *all* members of the public were excluded. (*Id.* at p. 62.) Further, even *Owens* appears to recognize, in contrasting "a mere fifteen or twenty-minute closure," that the Sixth Amendment right to a public trial "is not trammeled . . . by a trivial, inadvertent courtroom closure." (*Bowden v. Keane* (2d Cir. 2001) 237 F.3d 125, 129.)

Here, as in *Woodward*, there was only a temporary exclusion of certain spectators, occasioned by the court's concern that the spectators, who would be in immediate proximity with the prospective jurors in the body of the

---

[9] The court rejected the defendant's argument that the absence of his family and friends at trial raised special concerns, finding that the same standard applied to family members as to the general public. (*Owens, supra,* 483 F.3d at p. 62, fn. 12.)

[10] Habeas corpus relief was granted on remand. (*Owens v. U.S.* (D.Mass. 2007) 517 F.Supp.2d 570.)

courtroom, had not yet been admonished by defendant's counsel to refrain from comments that might prejudice the panel. Bui argues the spectators were "absent from [his] trial for a full day as a result of their intentional expulsion from the courtroom."[11] Whether or not they were ultimately absent for the balance of the day is not the issue—we look to whether the court's actions denied Bui his Sixth Amendment rights. Here, there is no question the spectators were excluded for as much as 40 minutes. There is also no question that the court, as soon as it was alerted to the issue, specifically ordered that they be allowed to return to the courtroom. The fact that the spectators may have left the courthouse during this roughly 40-minute period does not transform the temporary bar into a daylong exclusion.

■ We emphasize that we do not condone exclusion of any person from trial court proceedings without prior explicit consideration, on the record, of the criteria set forth in *Press-Enterprise* and *Waller* and appropriate findings. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1279 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) The United States Supreme Court in *Presley* has made it abundantly clear that it is incumbent upon every trial judge to comply with *Waller*'s directives in determining and articulating both the necessity to close a courtroom, and in considering all reasonable alternatives to closure. We reiterate that "[t]he exclusion of any nondisruptive spectator from a criminal trial should never be undertaken without a full evaluation of the necessity for the exclusion and the alternatives that might be taken. This evaluation should be reflected in the record of the proceedings. The evaluation would fulfill the statutory requirements, if any, for exclusion of persons from a trial and assist in the evaluation of any alleged constitutional violation." (*Esquibel, supra,* 166 Cal.App.4th at p. 556.) We also agree, however, with the conclusion of the Second District in *Esquibel* that "the temporary exclusion of select supporters of the accused does not create an automatic violation of the constitutional right to a public trial." (*Id.* at p. 554.)

■ Here three individuals were excluded for a very limited period, during only a small part of the voir dire of prospective jurors, and not during the evidentiary phase of the trial. They were allowed to return as soon as defense counsel brought the issue to the court's attention and assured the court that they had been appropriately admonished—an alternative to exclusion considered and promptly implemented by the court. Were we to preclude application of a de minimis analysis under such circumstances, even temporary removal of a spectator from proceedings simply for purposes of giving an appropriate advisement to refrain from comment or contact with jurors could constitute per se structural error. Given what we find to be the de minimis nature of the temporary exclusion of these individuals from only a limited portion of voir dire, we likewise find, as did the Supreme Court in

---

[11] As we have previously noted, the court recessed for the day at noon on June 7.

*Woodward*, that this "temporary 'closure' did not violate defendant's fundamental constitutional right to a public trial." (*Woodward, supra*, 4 Cal.4th at p. 379.)[12] We do not read *Presley* as mandating a different result.

B. *Exclusion of Evidence of Mark Pham's Alleged Criminal Background**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Simons, Acting P. J., and Needham, J., concurred.

A petition for a rehearing was denied April 30, 2010, and appellant's petition for review by the Supreme Court was denied June 30, 2010, S182703. Werdegar, J., and Corrigan, J., were of the opinion that the petition should be granted.

---

[12] Bui did not raise the issue of exclusion of the spectators without prior notice, as in *Woodward*. *Woodward* held that such "lack of notice does not establish denial of a public trial . . . [but] at most a procedural due process violation" analyzed under the *Chapman* test. (*Woodward, supra*, 4 Cal.4th at pp. 386, 387; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

* See footnote, *ante*, page 675.