**UNITED STATES of America,
Plaintiff,**

v.

**Timothy P. VILLAGOMEZ, Joaquina
V. Santos, and James A. Santos,
Defendants.**

**Criminal Case No. 08–00020.**

United States District Court,
D.N. Mariana Islands.

April 22, 2010.

Eric S. O'Malley, U.S. Department of Justice, Saipan, MP, for Plaintiff.

Brien Sers Nicholas, Law Office of Brien Sers Nicholas, Saipan, MP, David Lujan, Agana, GU, Joey P. San Nicolas, Attorney at Law, Tinian, MP, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' JOINT RENEWED MOTION FOR RELEASE PENDING APPEAL

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ..................................1107
  A. Trial Proceedings ....................................................1107
    1. Indictment and trial ...........................................1107
    2. Reserved seats ................................................1108
    3. The requests to release reserved seats .........................1110
  B. Post–Trial Proceedings ...........................................1111
    1. The first motions for release pending appeal ...................1111
    2. Sentencings ...................................................1111
    3. The first joint motion for release pending appeal ..............1112
    4. The joint renewed motion for release pending appeal ...........1112
  C. Arguments Of The Parties .........................................1112
    1. The defendants' opening arguments .............................1112
    2. The prosecution's response ....................................1113
    3. The defendants' reply .........................................1113
    4. The oral arguments ............................................1114

II.  LEGAL ANALYSIS .................................................1115
    A.  Standards For Release Pending Appeal .............................1115
        1.  The controlling statute ......................................1115
        2.  The "substantial question" requirement ..........................1116
    B.  Application Of The Standards ...................................1118
        1.  The "flight or danger" and "delay" requirements ..................1118
        2.  The "substantial question" and "likely to result in relief"
            requirements .............................................1118
            a.  Failure to raise a contemporaneous Sixth Amendment
                objection ..........................................1119
            b.  The Sixth Amendment right to a public trial ..................1119
                i.  The principles at stake...............................1119
                ii.  The balancing of interests .............................1121
                iii.  The Presley decision...............................1122
            c.  Do the defendants raise a "fairly debatable" Sixth
                Amendment claim?........................................1124
                i.  Was the defendants' trial "closed" to the public? ..........1125
                ii.  Were the unoccupied reserved seats "available"? ..........1128
                iii.  Must a court consider alternatives to reserved seating
                  in the absence of "closure"? ..........................1129

III.  CONCLUSION .....................................................1130

> "If at first you don't succeed,
> get a bigger hammer."

Alan Lewis [1]

Defendants, including the former lieutenant governor of the Commonwealth of the Northern Mariana Islands, who were convicted in a high-profile case of conspiracy to defraud the United States, wire fraud, theft from a program receiving federal funds, and bribery, have filed a joint renewed motion pursuant to 18 U.S.C. § 3143(b) for release from custody while their convictions are on appeal to the United States Court of Appeals for the Ninth Circuit. The trial judge denied their earlier motions for release pending appeal, finding that the defendants' claims of jury misconduct were not fairly debatable. Undaunted, the defendants now rely on "a bigger hammer," a contention that a recent United States Supreme Court decision, *Presley v. Georgia*, —— U.S. ——, 130 S.Ct. 721, —— L.Ed.2d —— (2010),

establishes that they have a fairly debatable claim that their Sixth Amendment right to a public trial was violated when the trial judge refused to open to the general public unoccupied seats in the courtroom reserved for visiting students. This matter was reassigned to me, as a visiting judge.[2] Therefore, I must decide whether the defendants have presented a fairly debatable claim of violation of their right to a public trial that warrants their release during the pendency of their appeals.

## I. INTRODUCTION AND BACKGROUND

### A. Trial Proceedings

#### 1. Indictment and trial

On January 15, 2009, a Grand Jury handed down a First Superseding Indictment against defendants Timothy P. Villagomez, the former lieutenant governor of

---

1.  BrainyQuote.com, http://www.brainyquote. com/quotes/authors/a/alan_lewis.html. (last visited April 19, 2010).

2.  The trial judge, Chief United States District Court Judge Alex R. Munson, stepped down as an active judge on February 28, 2010, and is now a senior judge.

the Commonwealth of the Northern Mariana Islands (CNMI) and the former executive director of the Commonwealth Utilities Corporation, the semi-autonomous agency responsible for providing power and water to the people of the CNMI, James A. Santos, the former Secretary of Commerce of the CNMI, and Joaquina V. Santos, the wife of James Santos and the sister of Timothy Villagomez. The First Superseding Indictment charged each of the defendants with conspiracy to defraud and to commit offenses against the United States, in violation of 18 U.S.C. § 371, wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2, and theft concerning a program receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. In addition, defendant Villagomez was charged with bribery concerning a program receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2, and defendants James Santos and Joaquina Santos were charged with bribery concerning a program receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(2) and 2.[3] The defendants were released pending trial on unsecured bonds and subject to certain pretrial conditions.

A jury trial in this case before Chief United States District Court Judge Alex R. Munson began with jury selection on March 30, 2009. Evidence began on March 31, 2009, and ran for sixteen days. Closing arguments and submission of the case to the jury occurred on April 23, 2009, and on April 24, 2009, the jury returned verdicts of guilty against all defendants on all charges. Verdict Form (docket no. 211). Defendants were again permitted to remain on release pending sentencing, subject to the pretrial release conditions previously set by the court.

The present motion for release pending appeal is based on incidents in the course of the jury trial, which the court will now consider in further detail.

## 2. *Reserved seats*

During the trial, Chief Judge Munson reserved for groups of visiting students several rows of seating in the public gallery, on the judge's right, behind the defense tables, and opposite the jury box, amounting to approximately half or perhaps slightly more than half of the public gallery. At oral arguments on the motion presently before the court, the parties agreed that photographs showing the courtroom layout and the position of the reserved seats would be helpful to an understanding of the motion and this ruling. Although I proposed that I would take such photographs myself, I subsequently discovered that the clerk's office had such photographs, taken by a member of the clerk's office staff for other purposes during the course of the trial of these defendants. I believe that inclusion of these photographs, taken by a neutral party for other purposes, will be unobjectionable to the parties.

The first photograph shows a view from the left aisle beside the seats reserved for students, to the right of the bench, with the back row of reserved seats occupied:

---

**3.** On August 8, 2008, before the First Superseding Indictment was handed down, a fourth defendant charged in the original Indictment, Anthony Guerrero, pleaded guilty to the charge of conspiracy to defraud and to commit offenses against the United States and was not recharged in the First Superseding Indictment. Guerrero has not appealed his sentence.

This second photograph shows a view from the back of the gallery, looking left, with seats reserved for students behind the left column, and with the bench between the columns:

This third photograph shows a view from the back of the gallery, looking right, with the bench to the left of the column and the jury box to the far right of the column:

The reserved seats were not occupied by visiting students on all eighteen days of the trial (during presentation of evidence, closing arguments, and the verdict); rather, the reserved seats were occupied, apparently never in their entirety, by visiting students only parts of some days, perhaps as few as three or four days of the eighteen days of the trial.

Other portions of the gallery, behind the prosecution tables, were also reserved for government personnel and witnesses and for the media. On one occasion, an attorney not involved in the case sat in the section reserved for government personnel or the press.

### 3. The requests to release reserved seats

On Tuesday, March 31, 2009, the first day of trial after jury selection, during a sidebar conference on an unrelated matter, counsel for defendant James Santos made the following request:

> MR. TORRES: I'd like to bring one thing up. I would like to request that the farther part of this courtroom be open. It was reserved for the students, and they did not show up, so we request that the public be allowed.
>
> THE COURT: That's not going to happen.

Transcript of Jury Trial, Day One, March 31, 2009 (docket no. 365) at 3. The trial judge provided no further explanation for his ruling. Following the trial judge's denial of defendant James Santos's request, none of the defendants objected to the trial judge's decision on any ground, let alone a Sixth Amendment public trial ground.

On a second occasion, on April 23, 2009, before the case was submitted to the jury,

the following exchange occurred out of the presence of the jurors:

MR. LUJAN [counsel for defendant Villagomez]: I'm not trying to nitpick, but throughout the trial, the members of the public have approached me asking how come they're not allowed to sit, for example, behind the prosecutors. We notice it says "U.S. Government" and then it says "Press," but you take, for example, I see Attorney Matt Gregory; he's allowed to sit there. He's not a member of either. He's just a member of the public, like other people. But other members of the public have been turned away when there's no more seats left among these pews behind us.

I guess that's another instance I'm asking the Court to discuss with the Marshals.

MR. QUICHOCHO [Counsel for defendant Joaquina Santos]: Also, Your Honor, if there are—I know that the seating right here to my left is not full with students. Can we open them up for the public, as well, Your Honor, as long as there's space?

THE COURT: No.

MR. QUICHOCHO: Thank you, Your Honor.

Defendants' Supplemental Memorandum In Support Of Renewed Motion For Release On Bail Pending Appeal (Defendants' Supplemental Memorandum) (docket no. 394), Exhibit B, at 3–4. Again, the trial judge provided no further explanation for his ruling and, again, none of the defendants objected to the trial judge's decision on any ground, let alone a Sixth Amendment public trial ground. Subsequently, after a further recess, during which the trial judge conferred with the United States Marshal, the trial judge stated the following in another sidebar:

THE COURT: ... The other thing, there was a statement about Mr. Grego-ry, Matthew Gregory, sitting over with the United States personnel. He said they—the United States asked him to sit there with them.

MR. O'MALLEY [The prosecutor]: It didn't come from me, Your Honor.

Defendants' Supplemental Memorandum, Exhibit B, at 5. The parties have not identified any further part of the trial transcript concerning the issue of reserved seating.

### B. Post–Trial Proceedings

### 1. The first motions for release pending appeal

On July 20, 2009, each of the defendants filed or joined in a motion (docket nos. 303, 304, 305) for release pending appeal, pursuant to 18 U.S.C. § 3143(b), asserting that such release was appropriate, primarily because their claims of juror misconduct were fairly debatable. By Order (docket no. 306), filed July 21, 2009, the trial judge denied the defendants' motions for release pending appeal, without prejudice, on the ground that the motions were premature, because the defendants had not yet been sentenced.

### 2. Sentencings

On August 5, 2009, the court sentenced defendant Villagomez to 87 months of imprisonment and sentenced James Santos and Joaquina Santos to 60 months of imprisonment each. Sentencing Hearing Minutes (docket nos. 311, 312, 313); Judgments (docket nos. 314, 315, 317). The court continued the defendants' release and directed the defendants to self-surrender at the correctional institutions designated by the Bureau of Prisons (BOP). Defendants all filed timely notices of appeal. *See* docket nos. 321, 324, 235, 326 (Amended Notice). The defendants' appeals are currently pending before the

Ninth Circuit Court of Appeals. The defendants all subsequently self-surrendered to the BOP.

### 3. The first joint motion for release pending appeal

On September 28, 2009, the defendants filed a joint Motion For Bail Pending Appeal (docket no. 349), again asserting that release was appropriate because their claims of juror misconduct were fairly debatable. By Order (docket no. 361), filed October 20, 2009, the trial judge denied the defendants' first joint motion for release pending appeal, finding that the defendants did not present a substantial question of law or fact on appeal, adopting and incorporating his ruling denying the defendants' motion for a new trial.

### 4. The joint renewed motion for release pending appeal

On March 2, 2010, the defendants filed the Joint Renewed Motion For Release Pending Appeal (docket no. 384) now before the court. In their joint renewed motion, the defendants argue that they should be released pending the outcome of their appeals, pursuant to 18 U.S.C. § 3143(b), on the ground that their claim on appeal that they were denied their Sixth Amendment right to a public trial—when the trial judge refused the defendants' request to open to the general public seating reserved for visiting students when the students did not appear—raises a substantial question of law or fact likely to result in reversal or an order for a new trial. The defendants contend that their claim is an issue of first impression under the Supreme Court's recent decision in *Presley v. Georgia,* —— U.S. ——, 130 S.Ct. 721, 725, —— L.Ed.2d —— (2010), which held that a trial court violated a defendant's Sixth Amendment right to public trial when it excluded the public

from *voir dire* proceedings without a compelling justification, consideration of reasonable alternative measures, or appropriate findings. The prosecution filed a timely Opposition (docket no. 386) to the defendants' motion on March 18, 2010. On April 12, 2010, the defendants filed a Joint Reply (docket no. 392) in further support of their motion, and on April 13, 2010, they filed a Supplemental Memorandum (docket no. 394) in further support of their motion raising the trial judge's second refusal to open to the general public unoccupied seating reserved for visiting students and government personnel or the press.

On April 14, 2010, acting as a visiting judge, I held oral arguments on the defendants' joint renewed motion. At the oral arguments, the prosecution was represented by Assistant United States Attorney Eric O'Malley. Defendant Villagomez was represented by Donald Horgan of Riordan & Horgan, San Francisco, California, who appeared by telephone, but who took the lead in the defendants' arguments, and by David Lujan and Leilani Lujan of Lujan Aguigui & Perez, L.L.P., Hagatna, Guam, both of whom appeared by telephone, and by Joey San Nicolas, Tinian, MP. Defendant James Santos was represented by Vincent Dlg. Torres of Torres Brothers, L.L.C., Saipan. Defendant Joaquina Santos was represented by Ramon K. Quichocho, Saipan.

### C. Arguments Of The Parties

### 1. The defendants' opening arguments

In support of their joint renewed motion for release pending appeal, the defendants assert that the trial judge's prior findings that they should be released pending trial, sentencing, and prior to self-surrender to serve their sentences demonstrate that their motion turns solely on whether they have identified a "substantial issue" on

appeal. They contend that they have made such a showing, because the Supreme Court's recent decision in *Presley v. Georgia*, —— U.S. ——, 130 S.Ct. 721, —— L.Ed.2d —— (2010), makes clear that the trial judge's refusal to release reserved seating, arguably made without a compelling justification, consideration of reasonable alternative measures, or appropriate findings, presents at least a substantial question of whether or not their Sixth Amendment right to a public trial was violated. They argue that a constitutional error of this sort is a "structural error" that is reversible *per se*, and cannot be deemed harmless.

Somewhat more specifically, they assert that the trial record shows that, during the afternoon session on March 31, 2009, the jury had been sworn and the trial had commenced; a block of seats inside the courtroom had been reserved for students; the students had not arrived; the defense requested that the public be permitted to use the now-available seating in the courtroom; and the trial judge denied the defendants' request in unequivocal terms. They argue, further, that the trial judge denied the request without identifying any overriding interest likely to have been prejudiced by permitting public use of available seating, much less ensuring that the resulting closure of the courtroom was no broader than needed to protect any such interest; the trial judge did not consider reasonable alternatives to refusing to permit members of the public to sit in the area left vacant by the students; and the trial judge made no findings adequate to support the closure of the area to members of the public who wished to enter the courtroom. This, they contend, was a violation of the defendants' Sixth Amendment right to a public trial under the standards set forth not only in *Presley*, but in the Supreme Court's earlier decision in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). They argue that it does not matter that some members of the public were able to attend, because this case involved very substantial public interest, the trial judge's ruling prevented many members of the public from attending the trial, and *Presley* found a Sixth Amendment violation when only a single member of the public, the defendant's uncle, was excluded from the relevant proceeding. They contend that the violation cannot be minimized in this case. At the very least, they contend that their argument based on *Presley* is "fairly debatable."

### 2. The prosecution's response

In a response of remarkable brevity, the prosecution asserts that there was simply no closure of the courtroom within the meaning of *Presley*. This is so, the prosecution argues, because several rows of seating were open to anyone on a first-come, first-served basis. The prosecution contends that, if late comers were barred because no seats were left, this circumstance does not diminish the public nature of the proceedings, citing *United States v. Scott*, 564 F.3d 34, 38 (1st Cir.2009), and *Bucci v. United States*, 677 F.Supp.2d 406, 414 (D.Mass.2009). Thus the prosecution contends that the trial judge's decision to reserve a portion of the courtroom's seats for use by the media and students did not impinge upon the defendants' Sixth Amendment right to a public trial, because every stage of the trial was open to the public. Because the defendants present no "fairly debatable" question, the prosecution asserts that the defendants' motion for release pending appeal should be denied.

### 3. The defendants' reply

In a reply considerably longer than the prosecution's response, the defendants as-

sert that they are presenting an important question of first impression to the Ninth Circuit Court of Appeals concerning the meaning of *Presley.* They also contend that there is no way of determining from the record how many members of the public, if any, were permitted to attend any of the trial proceedings, but the record does establish that, at the time of the trial judge's ruling, the trial was in progress, seating was available for public use, but the trial judge refused to allow members of the public to use that seating, and the trial judge offered no justification for his refusal, let alone any indication that he considered any alternatives to his refusal. The defendants contend that *Scott* is distinguishable, because here, there was no stated basis for refusing to allow the public to use available seating, no invitation to the public to fill available seating, and no basis for inferring that court personnel informed members of the public outside the courtroom that empty seats would be available to them. They also contend that *Bucci* is unlikely to survive appellate review in light of *Presley,* because stating that members of the public might mingle with prospective jurors as the justification for closing jury selection is now plainly inadequate.

### 4. The oral arguments

At the oral arguments, the defendants reiterated their contention that *Presley* held that there was a violation of the Sixth Amendment right to a public trial when a single member of the public was excluded, and the Court made clear that the trial courts are obligated to take every reasonable measure to accommodate attendance by members of the public at criminal trials. They clarified that they believe that *Presley* is a "sea change" in the law in two

respects: (1) it imposes on the trial court an obligation to consider reasonable alternatives to closure of the courtroom; and (2) it makes clear that merely preventing intermingling of members of the public with prospective jurors is not a sufficient justification for excluding the public from jury selection. The defendants explained their position to be, in essence, that where there are available public seats that were recognized as such by counsel and so presented to the court, and the court declined to permit any members of the public to fill those seats, there is simply no way that the issue the defendants raise cannot be considered, at a minimum, a novel question or at least a substantial question that depends upon application of *Presley, Waller,* and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

Although the defendants acknowledged that the prosecution was arguing that there was no closure at all, the defendants pointed out that the prosecution had cited no authority that the trial judge can exclude the public from available seating without considering justifications and reasonable alternatives. They also asserted that visiting students could not simply be considered members of the public, because the students were not there at the time that the request to use the reserved seating for members of the public was made. Similarly, they argued that the trial judge could not reserve a single seat for a visiting judge, then refuse to allow a member of the public to use that seat, if the visiting judge did not appear, without explanation or justification. They also argued that simply reserving some part of the courtroom for the public is not enough, if areas reserved for other groups stand empty, and there are people waiting to come into the courtroom.[4]

---

4. Counsel for one of the defendants also asserted for the first time at oral arguments that

the public was completely excluded from jury selection in this case, which would have been

The prosecution reiterated at oral arguments its position that the trial was, indeed, public, as members of the public were permitted in the courtroom at all times. The prosecution asserted that, in this case, the purposes of a public trial—ensuring, by public scrutiny, that all the participants were doing their jobs and acting with integrity—were clearly met.

## II. LEGAL ANALYSIS

### A. Standards For Release Pending Appeal

#### 1. The controlling statute

Release or detention of a defendant pending appeal is governed by 18 U.S.C. § 3143(b). *See United States v. Garcia,* 340 F.3d 1013, 1015 (9th Cir.2003); *United States v. Montoya,* 908 F.2d 450, 450–51 (9th Cir.1990); *United States v. Wheeler,* 795 F.2d 839, 840 (9th Cir.1986); *United States v. Handy,* 761 F.2d 1279, 1280–81 (9th Cir.1985). Section 3143(b)(1) provides, in pertinent part, as follows:

(b) **Release or detention pending appeal by the defendant.**—(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

18 U.S.C. § 3143(b)(1).[5]

Thus, the Ninth Circuit Court of Appeals joined the Third and Eleventh Circuit Courts of Appeals in concluding that,

---

a claim squarely within the ambit of *Presley.* However, lead counsel professed himself surprised by that assertion, and the claim was not previously raised or briefed, so that I find that it is not properly before the court.

**5.** Although the parties did not contest the issue, the court notes that it has jurisdiction to entertain the defendants' current motion, even though the defendants have already filed their respective notices of appeal. Section 3143(b) confers limited jurisdiction upon district courts to decide whether a convicted defendant is to be released pending appeal. *See United States v. Meyers,* 95 F.3d 1475,

1488 n. 3 (10th Cir.1996) ("Although the filing of a notice of appeal usually divests the district court of further jurisdiction, the initial determination of whether a convicted defendant is to be released pending appeal is to be made by the district court.") (citing *United States v. Affleck,* 765 F.2d 944, 954 (10th Cir.1985)); FED.R.CRIM.P. 46 (2002 Amendment notes) (stating that Rule 46(c) recognizes "that the district court retains jurisdiction to decide whether the defendant should be detained, even if a notice of appeal has been filed").

[U]nder the 1984 Bail Act [18 U.S.C. § 3143(b) ] a court must find the following to grant bail pending appeal:

(1) that the defendant is not likely to flee or pose a danger to the safety of any other person in the community if released;

(2) that the appeal is not for purpose of delay;

(3) that the appeal raises a substantial question of law or fact; and

(4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed.

*[United States v.] Giancola*, 754 F.2d [898,] 901 [ (11th Cir.1985) ]; *[United States v.] Miller*, 753 F.2d [19,] 24 [ (3d Cir.1985) ].

*Handy*, 761 F.2d at 1283; *accord Wheeler*, 795 F.2d at 840 (quoting *Handy* ); *United States v. Mett*, 41 F.3d 1281, 1282 n. 3 (9th Cir.1994) (noting that "a defendant shall be incarcerated pending appeal unless the court finds: (1) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released; (2) the appeal is not taken for the purpose of delay; (3) the appeal raises a substantial question of law or fact; and (4) if the substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal, an order for a new trial, or a sentence that does not include a term of imprisonment, on all counts on which imprisonment has been imposed.").

**2. The "substantial question" requirement**

The requirement of § 3143(b) that is principally at issue here is the requirement that "the appeal ... raises a substantial

question of law or fact likely to result in" relief. 18 U.S.C. § 3143(b)(1)(B). In the seminal decision of *United States v. Handy*, 761 F.2d 1279 (9th Cir.1985), the Ninth Circuit Court of Appeals explained that "a 'substantial question' is one that is 'fairly debatable' ... or 'fairly doubtful.'" *Handy*, 761 F.2d at 1283 (citations omitted); *see Garcia*, 340 F.3d at 1021 n. 5 ("In *Handy* we held that an issue is substantial if it is 'fairly debatable' or 'fairly doubtful,' that is, 'of more substance than would be necessary to a finding that it was not frivolous,'" quoting *Handy*, 761 F.2d at 1283, with internal quotations marks and citations omitted); *Wheeler*, 795 F.2d at 840 ("A 'substantial question' is one that is fairly debatable or fairly doubtful," citing *Handy*, 761 F.2d at 1283).

In arriving at the "fairly debatable" standard, the court in *Handy* looked to Congress's intent:

Congress did not intend to limit bail pending appeal to cases in which the defendant can demonstrate at the outset of appellate proceedings that the appeal will probably result in reversal or an order for a new trial. The legislative history states that the purpose of the statute is to require "an affirmative finding that the chance for reversal is substantial." S.Rep. No. 98–225, 98th Cong., 2d Sess. 27, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3210 ... a showing that the chance of reversal is substantial is, of course, very different from a showing that reversal is more likely than not ... [R]equiring the defendant to demonstrate to the district court that its ruling is likely to result in reversal is tantamount to requiring the district court to certify that it believes its ruling to be erroneous. Such an interpretation of the Act would make a mockery of the requirement of Fed. R.App.P. 9(b) that the application for

bail be made in the first instance in the district court. We do not think Congress intended to invalidate that requirement *sub silentio* and thereby to vest exclusive authority over post-sentencing bail motions in appellate courts.

*Handy,* 761 F.2d at 1280–81.

In *Handy,* the court next addressed "how much merit there must be to a question in order for a court to find it to be a 'substantial question.'" *Id.* at 1281. The court observed,

> Historically the phrase "substantial question" has referred to questions that are "fairly debatable." Included within this definition have been questions that are novel and not readily answerable.
>
>> "The question may be 'substantial' even though the judge or justice hearing the application for bail would affirm on the merits of the appeal. The question may be new and novel. It may present unique facts not plainly covered by the controlling precedents. It may involve important questions concerning the scope and meaning of decisions of the Supreme Court. The application of well-settled principles to the facts of the instant case may raise issues that are fairly debatable.
>>
>> *D'Aquino v. United States,* 180 F.2d 271, 272 (11th [sic] Cir.1950) (Douglas, Circuit Justice). Circuit Justice Douglas stated:
>>
>>> [T]he first consideration is the soundness of the errors alleged. Are they, or any of them, likely to command the respect of the appellate judges? It is not enough that I am unimpressed. I must decide whether there is a school of thought, a philosophical view, a technical argument,

an analogy, an appeal to precedent or to reason commanding respect that might possibly prevail.... A question may nevertheless be "substantial" ... if it is novel, or if there is a contrariety of views concerning it in the several circuits, or if the appellate court should give directions to its district judges on the question, or if in the interests of the administration of justice some clarification of an existing rule should be made.

*See also Williamson v. United States,* 184 F.2d 280, 282 (2d Cir.1950) (Jackson, Circuit Justice) ("It is one thing to maintain that the Court of Appeals has given the right answer to a substantial question, but it is another thing to contend that there is no question which merits answer by the only Court invested with ultimate and nation-wide authority in the matter.").

*Handy,* 761 F.2d at 1281.[6] The court also noted that the United States Supreme Court had determined that a "substantial question" is "something more than the absence of frivolity." *Id.* (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)) (internal quotation marks and citations omitted). From these and other precedents, the Ninth Circuit Court of Appeals concluded,

> [A] "substantial question" is one that is "fairly debatable," *D'Aquino v. United States,* 180 F.2d at 272; *accord Barefoot v. Estelle,* 103 S.Ct. at 3394 n. 4, or "fairly doubtful," *United States v. Miller,* 753 F.2d at 23. "In short, a 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous." *United States v. Giancola,* 754 F.2d at 901; *accord Barefoot v. Estelle,* 103 S.Ct. at

---

**6.** The *D'Aquino* decision was by the Ninth Circuit Court of Appeals, not the Eleventh Circuit Court of Appeals as indicated in the first citation to *D'Aquino* in the portion of *Handy* quoted above.

3394; *Gardner v. Pogue,* 558 F.2d 548, 551 (9th Cir.1977).

*Handy,* 761 F.2d at 1283.

Thus, to satisfy the "substantial question" requirement of § 3143(b) to obtain release pending appeal, the defendant is not required to convince the district judge entertaining the motion that he or she is right or will win on appeal—indeed, the district judge's opinion of the ultimate merits of the issue presented on appeal is irrelevant. Rather, the defendant must show that the issue raised on appeal is "fairly debatable," which is a function of the novelty of the question, the extent to which contrary views are possible, and the extent to which clarification of the issue would be helpful to the administration of justice, all tempered by the lack of frivolousness of the issue.

### B. Application Of The Standards

#### 1. The "flight or danger" and "delay" requirements

The defendants contend, and the prosecution does not dispute, that they meet the requirements of § 3143(b)(1)(A) that there is "clear and convincing evidence that [they are] not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title," and the first requirement of § 3143(b)(1)(B), that "the appeal is not for the purpose of delay." 18 U.S.C. § 3143(b)(1); *Handy,* 761 F.2d at 1283 (summarizing the first two requirements of § 3143(b)(1) as "(1) that the defendant is not likely to flee or pose a danger to the safety of any other person in the community if released; [and] (2) that the appeal is not for purpose of delay"); *accord Wheeler,* 795 F.2d at 840 (same, quoting *Handy* ); *Mett,* 41 F.3d at 1282 n. 3 (same). The defendants contend that, even though the trial judge denied their first motions for release pending appeal, he ordered their release pending trial, pri-

or to sentencing, and prior to self-surrender, recognizing that they were not dangerous or likely to flee. I agree that, in light of the prior determinations of the trial judge, none of the defendants constitutes a flight risk or a danger to the community. Moreover, I agree with the defendants that their appeals are not taken for the purpose of delay, where they have self-surrendered and are in custody, so that the appeals are not asserted for the purpose of delaying their imprisonment. Therefore, I conclude that the disposition of the defendants' joint renewed motion for release pending appeal turns on the remaining requirements of § 3143(b).

#### 2. The "substantial question" and "likely to result in relief" requirements

Those remaining factors are set forth in § 3143(b)(1)(B): that "the appeal ... [1] raises a substantial question of law or fact [2] likely to result in" relief. 18 U.S.C. § 3143(b)(1)(B); *Handy,* 761 F.2d at 1283 (describing the remaining requirements of § 3143(b) as "(3) that the appeal raises a substantial question of law or fact; and (4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed"); *accord Wheeler,* 795 F.2d at 840 (same, quoting *Handy* ); *Mett,* 41 F.3d at 1282 n. 3 (same). The defendants claim that they have raised a "substantial question" that their Sixth Amendment right to a public trial was violated when the trial judge refused to release to the general public unoccupied seats reserved for visiting students and the media, and that a violation of the right to a public trial necessarily requires relief, because it is a "structural" error. The prosecution counters that the trial judge's decision to reserve a portion

of the courtroom's seating for students did not violate the defendants' Sixth Amendment right to a public trial, because the courtroom was not closed to the public, but, in fact, open.

### a. Failure to raise a contemporaneous Sixth Amendment objection

The court notes that, at trial, none of the defendants objected to the court's refusal to release reserved seats to the general public on Sixth Amendment grounds. On March 31, 2009, only counsel for defendant James Santos requested that the court open the seats set aside for the students, but he never lodged a formal objection to the court's denial, let alone an objection based on the Sixth Amendment. Similarly, on April 23, 2009, when counsel for defendant Villagomez and counsel for defendant Joaquina Santos requested that the court allow members of the public to sit. in unoccupied reserved seats, neither counsel lodged a formal objection to the court's denial, let alone an objection based on the Sixth Amendment.

A defendant's failure to make a timely objection to closure of a courtroom on Sixth Amendment grounds may well constitute a waiver of the Sixth Amendment right to a public trial. *See Levine v. United States*, 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (stating that failure to object to closing of courtroom waived right to public trial); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir.2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial."). There is, however, plainly tension between this general principle and the Supreme Court's willingness to consider a Sixth Amendment claim in *Presley v. Georgia*, —— U.S. ——, 130 S.Ct. 721, —— L.Ed.2d —— (2010). In *Presley*, the defendant asserted that the court's exclusion of the sole member of the public present at

the beginning of jury selection, the defendant's uncle, was "'the exclusion of the public from the courtroom,'" but the defendant did not cite a Sixth Amendment right to a public trial. *Presley*, 130 S.Ct. at 722 (citing the decision of the Georgia Supreme Court at 285 Ga. 270, 271, 674 S.E.2d 909, 910 (2009)). Nevertheless, the Court summarily granted relief for a violation of the defendant's Sixth Amendment right to a public trial. *Id.* at 723–25. The explanation for the Court's willingness to grant relief, notwithstanding failure of the defendant to assert a contemporaneous claim of a Sixth Amendment violation, may be simply that there was no indication in *Presley* that the prosecution ever asserted that the defendant had waived a Sixth Amendment claim by failing to raise a contemporaneous Sixth Amendment objection. The same situation obtains here, where the prosecution has never asserted that the defendants waived their claim of a violation of the Sixth Amendment right to a public trial. Therefore, I will consider the defendants' claim of violation of their Sixth Amendment right to a public trial on the merits—to the extent of determining whether the claim is "fairly debatable"—without regard to whether or not that claim might have been waived.

### b. The Sixth Amendment right to a public trial

***i. The principles at stake.*** The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. CONST., amend. VI. The United States Supreme Court has observed that:

> "'"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators

may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...." ' " [*Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) ] (quoting *In re Oliver*, 333 U.S. 257, 270, n. 25, 68 S.Ct. 499, 506, n. 25, 92 L.Ed. 682 (1948), in turn quoting T. Cooley, Constitutional Limitations 647 (8th ed.1927)).

*Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *see In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

The Sixth Amendment right to a public trial is founded on the long-standing fear of secret trials, as the Court explained in its decision in *In re Oliver:*

> The traditional Anglo–American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possi-

ble abuse of judicial power. One need not wholly agree with a statement made on the subject by Jeremy Bentham over 120 years ago to appreciate the fear of secret trials felt by him, his predecessors and contemporaries. Bentham said: "* * * suppose the proceedings to be completely secret, and the court, on the occasion, to consist of no more than a single judge,—that judge will be at once indolent and arbitrary: how corrupt soever his inclination may be, it will find no check, at any rate no tolerably efficient check, to oppose it. Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.'

*In re Oliver*, 333 U.S. at 268–71, 68 S.Ct. 499 (footnotes omitted) (quoting Jeremy Bentham, 1 *Rationale of Judicial Evidence* 524 (1827)).

The Ninth Circuit Court of Appeals has stated that "a defendant's right to a public trial is only implicated by a 'closure.' " *United States v. Shryock*, 342 F.3d 948, 974 (9th Cir.2003), *cert. denied*, 541 U.S. 965, 124 S.Ct. 1729, 158 L.Ed.2d 411 (2004). The Ninth Circuit Court of Appeals explained,

> In *Estes v. Texas*, 381 U.S. 532, 588–89, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Justice Harlan stated in concurrence:
> Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats.... A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves

with decorum, and observe the trial process.

> See also United States v. Kobli, 172 F.2d 919, 923 (3d Cir.1949) (stating that the constitutional right to a public trial does not require holding trial in a place large enough to accommodate all those who desire to attend).

Shryock, 342 F.3d at 974; see Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 610, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (noting that the Sixth Amendment's "requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed."). Thus, the Ninth Circuit Court of Appeals has held that "the size of the courtroom d[oes] not amount to a 'closure,' and therefore d[oes] not implicate [a defendant's] Sixth Amendment right to a public trial," where the trial was "always open to the public" in the sense that "the district court allowed [the defendants'] family members and the general public to use the available seating." Id. Furthermore, the court held that a defendant does not have a Sixth Amendment right "to force the district court to expand what was sufficient courtroom seating to accommodate family members who did not attend the trial." Id. at 975.

■ Finally, because of the " 'great, though intangible, societal loss that flows' from closing courthouse doors," the denial of a right to a public trial is considered a structural error for which prejudice is presumed. Waller, 467 U.S. at 50 n. 9, 104 S.Ct. 2210 (quoting People v. Jones, 47 N.Y.2d 409, 418 N.Y.S.2d 359, 391 N.E.2d 1335, 1340 (N.Y.1979)); see Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (noting that a defendant's Sixth Amendment right to a public trial is of such importance that any error affecting it is deemed "structural," making the denial of the right one of the "limited class of cases" where reversal is required.), see also Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (characterizing the denial of the Sixth Amendment right to a public trial as a "structural" error, citing Waller, 467 U.S. at 39, 104 S.Ct. 2210); Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir.2007) (noting that the limited number of "structural errors" recognized by the Supreme Court includes violation of the right to a public trial); Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir.2005) (same).

■ ii. The balancing of interests. Notwithstanding the importance of the right to a public trial, as evidenced by the Sixth Amendment and the determination that a violation of that right is a "structural error" that requires reversal, a defendant's right to a public trial is not absolute, but "may give way in certain cases to other rights or interests." Waller, 467 U.S. at 45, 104 S.Ct. 2210; United States v. Lnu, 575 F.3d 298, 305 (3rd Cir.), cert. denied, —— U.S. ——, 130 S.Ct. 771, 175 L.Ed.2d 537 (2009); Crawford v. Minnesota, 498 F.3d 851, 853 (8th Cir.2007) (noting one long-standing exception is when a young victim is called to testify regarding an alleged sexual offense); Bell v. Jarvis, 236 F.3d 149, 165 (4th Cir.2000) (noting that an exception is when the government shows an adequate interest in inhibiting disclosure of sensitive information), cert. denied sub nom. Bell v. Beck, 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001); United States v. DeLuca, 137 F.3d 24, 33 (1st Cir.), cert. denied, 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); United States v. Brazel, 102 F.3d 1120, 1155 (11th Cir.), cert. denied sub nom. Jefferson v. United States, 522 U.S. 822, 118 S.Ct. 78, 139 L.Ed.2d 37 (1997); United States v. Osborne, 68 F.3d 94, 98 (5th Cir.1995) (describing the countervailing interests as ones "essential to the administration of

justice"); *United States v. Sherlock*, 962 F.2d 1349, 1357–58 (9th Cir.1989) (noting that "[t]he right to a public trial has always been interpreted as being subject to the trial judge's power to keep order in the courtroom.") (internal quotation marks and citations omitted), *cert. denied sub nom. Charley v. United States*, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992).

Even though a defendant's right to a public trial may be subject to countervailing interests, the Supreme Court has instructed that the instances where courtroom closure will be warranted are "rare," cautioning that "the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45, 104 S.Ct. 2210; *Johnson v. Sherry*, 586 F.3d 439, 445 (6th Cir.2009). Indeed, the Court has made clear that there is a "presumption of openness." *Press–Enterprise, Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) *(Press–Enterprise I); Gibbons v. Savage*, 555 F.3d 112, 116 (2nd Cir.), *cert. denied*, —— U.S. ——, 130 S.Ct. 61, 175 L.Ed.2d 233 (2009). Thus, to overcome the presumption of openness and to attain the proper balance of interests, the Court set out in *Waller* the following test for the closure of criminal hearings or trials:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48, 104 S.Ct. 2210. This test was first developed by the Supreme Court in *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819, in the context of the public's and the press's First Amendment right to public jury selection, but it was applied by the Court in *Waller* in the context of a defendant's Sixth Amendment right to a public trial. *See Waller*, 467 U.S. at 46, 104 S.Ct. 2210. The Court explained that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Id.* Thus, at least in terms of the balancing test to decide when closure of the courtroom is appropriate, the First Amendment and Sixth Amendment rights to a public trial appear to be coterminous.

***iii. The Presley decision.*** The Supreme Court's latest pronouncement on the Sixth Amendment right to a public trial came earlier this year in *Presley v. Georgia*, —— U.S. ——, 130 S.Ct. 721, —— L.Ed.2d —— (2010). In Presley, the defendant's uncle, who had been the only member of the public sitting in the courtroom before jury selection was to begin, was told by the trial court that "he was not allowed in the courtroom and had to leave the floor of the courthouse entirely." *Id.* at 722. When the defendant's counsel objected to " 'the exclusion of the public from the courtroom,' " the trial court explained, " '[t]here just isn't space for them to sit in the audience.' " *Id.* (quoting *Presley v. State*, 285 Ga. 270, 674 S.E.2d 909, 910 (2009)). Defense counsel then requested " 'some accommodation,' " to which the trial court responded:

> " 'Well, the uncle can certainly come back in once the trial starts. There's no, really no need for the uncle to be present during jury selection.... [W]e have 42 jurors coming up. Each of those rows will be occupied by jurors. And his uncle cannot sit and intermingle with members of the jury panel. But, when the trial starts, the opening statements and other matters, he can certainly come back into the courtroom.' "

*Id.* (quoting *Presley*, 674 S.E.2d at 910). After he was convicted, the defendant asserted that his Sixth and Fourteenth Amendment rights to a public trial were violated when the trial court excluded the public from the *voir dire* of prospective jurors. *Presley*, 130 S.Ct. at 722.

In *Presley*, the Supreme Court addressed two issues: first, whether the right to a public trial in criminal cases extends to *voir dire* of prospective jurors and, if so, when the right to a public trial may give way to other rights or interests. *Presley*, 130 S.Ct. at 723–25. As to the first issue, the Court concluded that "the Sixth Amendment right to a public trial extends to the voir dire of prospective jurors." *Id.* at 724. The Court relied on *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819, which held that the First Amendment right to a public trial applies to the *voir dire* of prospective jurors, and *Waller*, 467 U.S. at 46, 104 S.Ct. 2210, which relied on *Press–Enterprise I* to hold that a defendant's Sixth Amendment right to a public trial applies beyond the actual proof at trial, in *Waller*, to a suppression hearing. *Id.* As to the second issue, the Court reiterated the statement in *Waller* of the standards courts are to apply before excluding the public from any stage of a criminal trial: "'[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.'" *Id.* at 724 (quoting *Waller*, 467 U.S. at 48, 104 S.Ct. 2210).

Somewhat more specifically, as to the second issue, while the Georgia Supreme Court had concluded "that trial courts need not consider alternatives to closure absent an opposing party's proffer of some alternatives," and that this was an "open question" under the United States Supreme Court's precedents, the United States Supreme Court disagreed, finding that "the statement in *Waller* that 'the trial court must consider reasonable alternatives to closing the proceeding' settles the point." *Id.* (quoting *Waller*, 467 U.S. at 48, 104 S.Ct. 2210). The Court found that a still more explicit statement in *Press–Enterprise I* left no room for doubt: "'Even with findings adequate to support closure, the trial court's orders denying access to voir dire testimony failed to consider whether alternatives were available to protect the interests of the prospective jurors that the trial court's orders sought to guard. Absent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire.'" *Id.* (quoting *Press–Enterprise I*, 464 U.S. at 511, 104 S.Ct. 819). Furthermore, the Court explained,

> The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." [*Press–Enterprise I*, 464 U.S.], at 505, 104 S.Ct. 819. The public has a right to be present whether or not any party has asserted the right. In *Press–Enterprise I*, for instance, neither the defendant nor the prosecution requested an open courtroom during juror voir dire proceedings; in fact, both specifically argued in favor of keeping the transcript of the proceedings confidential. *Id.*, at 503–504, 104 S.Ct. 819. The Court, nonetheless, found it was error to close the courtroom. *Id.*, at 513, 104 S.Ct. 819.

*Presley*, 130 S.Ct. at 724–25. The Court then held, "Trial courts are obligated to

take every reasonable measure to accommodate public attendance at criminal trials." *Id.* at 725. The Court noted that "[w]ithout knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members." *Id.*

Although the petitioner in *Presley* also asserted that the trial court erred because it did not even identify an overriding interest likely to be prejudiced absent the closure of *voir dire*, a contention that the Court found had "some merit," the Court found that it did not need to consider whether the trial court had an "overriding interest" in closing *voir dire*. The Court found that this was so, because "it was still incumbent upon [the trial court] to consider all reasonable alternatives to closure," and all that the Supreme Court had to decide was that the trial court did not do so. *Id.* at 725.[7]

### c. Do the defendants raise a "fairly debatable" Sixth Amendment claim?

■ In support of their joint renewed motion for release pending appeal, the defendants assert that, in light of *Presley*, they have raised a "substantial question," *see* 18 U.S.C. § 3143(b)(1)(B), that is, a "fairly debatable" claim, *see Handy*, 761 F.2d at 1283, that the trial judge violated their Sixth Amendment right to a public trial when the trial judge failed to consider or apply the *Waller* test before refusing to release unoccupied reserved seats or to consider alternatives before refusing to do so. This argument that the defendants' right to a public trial was violated, however, is based on arguments that the courtroom was "closed" to the public, when unoccupied reserved seats were not made available to the general public, that the reserved seats were "available," because they were unoccupied, and that a court must consider alternatives before refusing to open to members of the public generally unoccupied, and therefore "available," re-

---

**7.** The court notes that the defendants suggest that *Presley* constitutes a "sea change" in the standards for a claim of violation of the Sixth Amendment right to a public trial. The court finds that contention doubtful at best, because *Presley* is itself a *per curiam* decision in which the Court found that the extension of the Sixth Amendment right to a public trial to jury selection was so well settled that the Court could proceed "by summary disposition." *Presley,* 130 S.Ct. at 723–24 & 724 (finding the issue well settled). The court also notes that *Presley* relies entirely on settled principles from *Waller* and *Press–Enterprise I,* decisions already more than two decades old.

At oral arguments, the court asked the defendants to clarify in what respects *Presley* constitutes a "sea change." They responded that it is a "sea change," first, because *Presley* establishes that it is the obligation of the trial court to consider, even *sua sponte,* reasonable alternatives to closure of the courtroom and, second, because *Presley* establishes that a concern about intermingling of members of the

public and potential jurors is not sufficient to justify exclusion of the public from jury selection.

The Court in *Presley* expressly rejected the notion that requiring the trial court to consider alternatives to closure of the courtroom, even when alternatives are not offered by the parties, was a "sea change," because the Court held that principle was "clear not only from this Court's precedents" but also from the premise that " '[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system.' " *Presley,* 130 S.Ct. at 724 (quoting *Press–Enterprise I,* 464 U.S. at 505, 104 S.Ct. 819). The second aspect in which *Presley* is purportedly a "sea change" simply has nothing to do with this case, because the purported violations of the defendants' Sixth Amendment right to a public trial did not occur during jury selection and a concern about intermingling of members of the public with potential jurors (or even trial jurors) was never properly raised as a justification in this case. *See supra,* note 4.

served seats, whether or not the refusal to make the seats available constitutes a "closure." With all due respect to the creative arguments of the defendants, ably argued by defense counsel, I find that none of these arguments is remotely supported by *Presley* or any other precedent cited by the defendants and, thus, none is "fairly debatable."

*i. Was the defendants' trial "closed" to the public?* The defendants assert— albeit not entirely consistently—that the trial judge's refusal to release unoccupied reserved seating for use by the general public was a "closure" of the courtroom. It is, perhaps, easier to define an "open" or "public" trial—the right guaranteed by the Sixth Amendment—than it is to define a "closed" one. In *Shryock*, the Ninth Circuit Court of Appeals described a trial as "always open to the public," in the sense that "the district court always allowed [the defendants'] family members and the general public to use the available seating." *Shryock*, 342 F.3d at 974. A "public" trial, however, does not require that every interested member of the general public, the defendant's family, or the press be allowed to attend. As Justice Harlan stated, in his concurrence in *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), "Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission." *Estes*, 381 U.S. at 588–89, 85 S.Ct. 1628

(Harlan, J., concurring). In short, a "public" trial is a trial that members of the general public, the defendant's family members, and the press are allowed to attend, at least in some numbers.

It follows that the converse of a "public" trial, the "closure" of a trial, is the exclusion of *all* members of the general public, the defendant's family, and the press. Indeed, that is what the Supreme Court described as a "closure," not only in *Waller*, but in *Presley*. *See Waller*, 467 U.S. at 42, 104 S.Ct. 2210 (the trial judge "closed" the suppression hearing to all persons other than witnesses, court personnel, the parties, and the lawyers); *Presley*, 130 S.Ct. at 722 (the trial judge excluded the only member of the public present before jury selection was to begin). Although the defendants apparently read *Presley* to hold that a "closure" occurs if even one member of the public is excluded from the courtroom, such a reading is not "fairly debatable." The only reasonable reading of *Presley* is that an improper "closure" violates a defendant's Sixth Amendment right to a public trial, even if the "closure" actually excludes only one member of the public who wishes to attend the proceedings. *Presley*, 130 S.Ct. at 724–25. Nothing in *Presley* suggests that the Supreme Court now has a definition of "open" that is different from allowing defendants' family members and the general public to use available seating, or a definition of "closure," as the converse of "open," that is different from the exclusion of all members of the public from all or parts of the proceedings.[8]

**8.** Some federal circuit courts of appeals, including the Ninth Circuit Court of Appeals, have distinguished the complete "closure" in *Waller* from "partial closures," that is, closure of the courtroom to a particular category of the public, such as members of the defendant's family. In cases where a trial court orders a partial closure at the request of one party, courts have required only a "substantial reason" for the partial closure, instead of the more stringent "overriding interest" required by *Waller*. *See Sherlock*, 962 F.2d at 1358–59 (holding that removal of the defendants' family members from the courtroom during a rape victim's testimony did not violate the defendants' right to a public trial);

Here, the trial court reserved specific sections of the gallery for visiting students, the press, and government personnel and witnesses, but unlike the situation in either *Waller* or *Presley*, the trial court did not exclude the public entirely from the proceedings by declining the defendants' requests to allow members of the public to sit in unoccupied seats in reserved areas. *See Waller*, 467 U.S. at 42, 104 S.Ct. 2210 (excluding all members of the public from a seven-day suppression hearing); *Presley*, 130 S.Ct. at 725 (excluding the only member of the public present from jury selection). Some substantial part of the courtroom, albeit perhaps less than half, remained available at all times for members of the public, presumably on a first-come, first-seated basis, during the defendants' trial. The Court in *Presley* suggested that the public is "accommodated," if, for example, the trial judge reserves one or more rows for the public. *Id.* Here, even with the various sections of seating reserved for visiting students, government witnesses or person-nel, and the press, one or more rows (indeed, several rows) of seating remained available for the public. Unlike the circumstances in *Presley*, but like the circumstances in *Shryock*, the defendants' trial "was always open to the public," in the sense that "the district court always allowed [the defendants'] family members and the general public to use the available seating." *Shryock*, 342 F.3d at 974.

The reservation of part of the gallery seating for visiting students was similar in effect to using a courtroom of limited size, in that it did not exclude all members of the public or all of the defendants' family members from the trial, although it may have excluded some members of the general public from the courtroom for lack of available seats. In *Shryock*, the Ninth Circuit Court of Appeals rejected the defendants' argument that the limited audience seating in the courtroom amounted to a *de facto* closed courtroom in violation of the right to a public trial, where the defendant's "family members and the general

*see also Osborne*, 68 F.3d at 98–99 (holding that trial court did not violate a defendant's right to a public trial when it partially closed the courtroom, allowing all but one of the existing spectators, the defendant's sister, to remain, during the testimony of twelve-year-old kidnaping victim); *United States v. Farmer*, 32 F.3d 369, 370 (8th Cir.1994) (upholding the partial closure of the courtroom, by excluding all members of the public other than the victim's family members and her treating psychologist, during the testimony of a seventeen-year-old victim of sexual assault); *Woods v. Kuhlmann*, 977 F.2d 74, 76–77 (2nd Cir. 1992) (holding that protecting the safety of a witness, who was " 'scared to death' because she had been threatened by at least one member of the defendant's family," to be an interest substantial enough to allow the partial closure of the courtroom, consisting of excluding only members of the defendant's family and only for the duration of the witness's testimony); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir.) (holding that a defendant's Sixth Amendment right to a public trial was not violated by trial court's exclusion of the defendant's relatives from the courtroom while the victim testified), *cert. denied*, 493 U.S. 957, 110 S.Ct. 373, 107 L.Ed.2d 359 (1989); *Douglas v. Wainwright*, 739 F.2d 531 (11th Cir.1984) (affirming the exclusion of members of the general public other than the defendant's family, the witness's family, and press from the courtroom during a rape victim's testimony in order to protect that witness from insult and embarrassment), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). Courts have recognized that the "substantial reason" test is more appropriate in partial closure cases "because a partial closure does not 'implicate the same secrecy and fairness concerns that a total closure does.' " *Farmer*, 32 F.3d at 371 (quoting *Woods*, 977 F.2d at 76). Here, the defendants do not contend, and I do not find, that the trial judge's actions in this case constituted a partial closure of the courtroom, in the sense that those actions excluded only an identifiable category of the general public from the courtroom.

public were allowed to use the available seating." *Shryock,* 342 F.3d at 974. In so concluding, the Ninth Circuit Court of Appeals cited *Estes,* 381 U.S. at 588–89, 85 S.Ct. 1628 (Harlan, J., concurring), for the proposition that "[a] public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process," and *Kobli,* 172 F.2d at 923, for the proposition that the constitutional right to a public trial does not require holding trial in a place large enough to accommodate all those who desire to attend.

Other federal appellate courts have held that similar limitations on available seating for the general public during a jury trial do not constitute "closure" under the Sixth Amendment. *See United States v. Scott,* 564 F.3d 34, 36–39 (1st Cir.2009) (rejecting a defendant's claim that his Sixth Amendment right to a public trial was violated when the court barred members of the public from entering or leaving the courtroom while the court was charging the jury, "presumably to avoid distracting the jury during the ... charge," concluding that no closure had occurred because the "public was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provision of the Constitution," and "that a hypothetical member of the public who arrived late ... might have been barred from the proceedings does not undermine the public nature of the proceedings"); *Bell v. Evatt,* 72 F.3d 421, 433 (4th Cir.1995) ("[A] defendant's right to a public trial is not implicated by temporary limitation of ingress and egress to the courtroom to prevent disturbance of the proceedings."); *Knapp v. Leonardo,* 46 F.3d 170, 177 (2nd Cir.1995) (holding that defendant's Sixth Amendment right to a

public trial was not violated by the fact that defendant's trial was held in a church hall, due to renovations being performed on the county courthouse, where the location of the trial did not restrict the public's access to the trial); *Herring v. Meachum,* 11 F.3d 374, 380 (2d Cir.1993) (holding that trial was never "closed," even though the court locked the courtroom doors during the jury charge, because all members of the public who wanted to observe the charge were permitted to do so if there was enough space and they arrived in time); *Douglas v. Wainwright,* 739 F.2d 531, 532–33 (11th Cir.1984) (concluding that exclusion of members of the public from the courtroom during testimony of one witness in the case did not constitute a Sixth Amendment violation where "the press and family members of the defendant, witness, and decedent were all allowed to remain"), *cert. denied,* 469 U.S. 1208 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

Finally, as the prosecution suggests, the purposes of the Sixth Amendment right to a public trial were served in this case. Again, as the Supreme Court explained in *Waller,* "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller,* 467 U.S. at 46, 104 S.Ct. 2210 (internal quotation marks and citations omitted); *see also In re Oliver,* 333 U.S. at 270, 68 S.Ct. 499 (explaining that the right to a "public trial" is founded, in part, on the premise that "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power"). There was no possibility here that a secret trial— and absolutely nothing on the scale of the

notorious practices of the Spanish Inquisition, the English Court of Star Chamber, or the French monarchy's abuse of the lettre de cachet—could or did occur. *In re Oliver,* 333 U.S. at 270, 68 S.Ct. 499. Here, there is no "fairly debatable" question that the purpose of public scrutiny of the treatment of the defendants, to act as a guarantee of responsible behavior by the participants in the trial, were met.

While the defendants' argument that the courtroom was somehow "closed" is certainly novel, I find no reasonable reading of *Presley* could support their argument. *Handy,* 761 F.2d at 1281–83 (explaining when a claim is "fairly debatable," such that it is a "substantial question" within the meaning of § 3143(b)(1)). I also find that the clarification of *Presley* to adopt or reject their reading is simply unnecessary. *Id.* Finally, I find that the claim that the defendants' trial was "closed" lacks any other support. *Id.* A description of the circumstances presented here as a "closure" of the courtroom is *not* "fairly debatable," but simply unsupported by any case law or other authority. In short, the defendants present no "substantial question" concerning "closure" of their trial, or an alleged violation of their Sixth Amendment right to a public trial because of that "closure," and no possibility of relief based on such a question. *See* 18 U.S.C. § 3143(b)(1) (to obtain release pending appeal, the defendant must show that he has raised a "substantial question" likely to entitle him to relief). Therefore, the defendants are not entitled to release pending appeal on the basis of that question.

*ii. Were the unoccupied reserved seats "available"?* A theme running through the defendants' arguments is that unoccupied reserved seats were "available." However, the defendants have not cited any authority that supports that contention. Justice Harlan's concurrence in

*Estes* is not authority that supports this argument, even though Justice Harlan did describe the Sixth Amendment right to a public trial as implying that "the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process," see *Estes,* 381 U.S. at 589, 85 S.Ct. 1628 (Harlan, J., concurring). Justice Harlan may also have implied that the public trial guarantee is violated if an individual member of the public cannot gain admittance to a courtroom when there *are* available seats, *see id.* at 588, 85 S.Ct. 1628 (stating the converse proposition, that "[o]bviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats"). Nevertheless, nothing in Justice Harlan's concurrence or the majority's opinion in *Estes* defined "available" seats, let alone defined unoccupied reserved seats as "available," nor was Justice Harlan's discussion in the context of an exclusion of persons from the courtroom, but in the context of whether televising a trial was required by the right to a public trial guaranteed by the Sixth Amendment. *Id.* at 588, 85 S.Ct. 1628 (considering whether the Sixth Amendment right to a public trial or any other constitutional provision guarantees a right to televise trials).

Such a contention falls short of the "fairly debatable" requirement, even if it is a question of first impression, because it is both illogical and unsupported by any case law. *Handy,* 761 F.2d at 1283 (a frivolous claim is not "fairly debatable"). Reserved seating is necessarily set aside for one group, so that it will be available when members of that group are present, even if they are not present every moment of the trial. For example, the Supreme Court did recognize in *Presley* that portions of a courtroom could be reserved for the public to ensure that members of the public, in

general, had some access to the proceedings. *Presley,* 130 S.Ct. at 725; *see also In re Providence Journal Co., Inc.,* 293 F.3d 1, 16 (1st Cir.2002) (the district court reserved seating for members of the press, thus fulfilling First Amendment obligations). Nothing in *Presley* suggests that, if a seat in the area reserved for students were momentarily vacated, that seat could be claimed by a member of the general public as "available." If a member of the general public could claim such an unoccupied seat as "available," then the reservation of the seat for the students would be meaningless. I have not found, and the defendants have not cited, any case that treated reserved, but unoccupied seats as "available" seats.

*iii.* **Must a court consider alternatives to reserved seating in the absence of "closure"?** Perhaps realizing the fatal flaws in their "closure" argument, the defendants attempt, in the alternative, to read *Presley* to create some sort of "freestanding" right to access to "available" seating, regardless of whether the courtroom was "closed," under the Sixth Amendment guarantee of a public trial. Specifically, at oral arguments, when confronted with the prosecution's assertion that there was simply no "closure" of the trial at all, the defendants pointed out that the prosecution had cited no authority that the trial judge can exclude the public from available seating without considering justifications and reasonable alternatives and that simply reserving some part of the courtroom for the general public is not enough, if areas reserved for other groups stand empty, and there are people waiting to come into the courtroom. The defendants' assertion that the prosecution has cited no authority that the trial judge can exclude the public from available seating without considering justifications and reasonable alternatives misses the point. The defendants have cited no precedent that

the *Waller/Press–Enterprise I* analysis of alternatives must be conducted before excluding members of the public from any seat or seats in the courtroom in the absence of a "closure" of the courtroom. The Supreme Court's recent decision in *Presley* certainly is not such authority, because *Presley* did involve a "closure" of the courtroom, in the form of a total exclusion of the public from jury selection, *see Presley,* 130 S.Ct. at 722, not just reservation of seats for some other group that then stood empty. Other precedents supporting a "consideration of alternatives" requirement under the Sixth Amendment also expressly addressed that requirement *in the context of alternatives to "closure."*

First, in *Waller,* the Supreme Court expressly recognized the "consideration of alternatives" requirement in the context of *a party seeking to close the hearing. Waller,* 467 U.S. at 48, 104 S.Ct. 2210 ("*[T]he party seeking to close the hearing* must advance an overriding interest that is likely to be prejudiced, *the closure* must be no broader than necessary to protect that interest, the trial court *must consider reasonable alternatives to closing the proceeding,* and it must make findings adequate to support *the closure.*" (emphasis added)). Second, *Presley,* on which the defendants rely for their contention that the trial judge must consider alternatives to leaving a reserved seat unoccupied, whether or not there is a "closure" of the courtroom, is clearly not such precedent. *Presley* involved the exclusion of the public entirely from *voir dire, Presley,* 130 S.Ct. at 722, not just the trial court's failure to consider whether a member of the public should have access to an available seat, and the statement in *Presley* that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," *id.* at 725, was in the context of that total "closure." *See*

*also Presley,* 130 S.Ct. at 724 (quoting *Waller* for the proposition that "the trial court must consider" "alternatives to closing the proceedings," and a similar discussion of the court's obligation to consider "alternatives to closure" in *Press–Enterprise I,* 464 U.S. at 511, 104 S.Ct. 819). Thus, a reading of *Presley* as creating a free-standing obligation on the court to consider whether the public may be otherwise accommodated before denying the public access to a particular seat in the courtroom, in the absence of a "closure" of the courtroom, is not "fairly debatable," but unsupported by any authority." [9]

I find no reasonable reading of *Presley* could support the defendants' argument that the trial judge was required to consider, in the absence of a "closure" of the courtroom, whether there were alternatives to refusing the public access to unoccupied reserved seating. *Handy,* 761 F.2d at 1281–83 (explaining when a claim is "fairly debatable," such that it is a "substantial question" within the meaning of § 3143(b)(1)). I also find that the clarification of *Presley* to adopt or reject their reading is simply unnecessary. *Id.* Finally, I find that the claim that the court had such an obligation in the absence of a "closure" of the courtroom lacks any other support. *Id.* In short, the defendants present no "substantial question" concerning violation of their Sixth Amendment right to a public trial in the absence of a "closure," and no possibility of relief based on such a question. *See* 18 U.S.C. § 3143(b)(1) (to obtain release pending appeal, the defendant must show that he has raised a "substantial question" likely to entitle him to relief). Therefore, the de-

fendants are not entitled to release pending appeal on the basis of that question.

### III. CONCLUSION

Upon the foregoing, I find that the defendants have failed to identify a "substantial question"—*i.e.,* a "fairly debatable" issue—concerning a violation of their Sixth Amendment right to a public trial, that, if decided in their favor, would likely result in reversal, a new trial, or a substantially lower sentence. *See* 18 U.S.C. § 3143(b)(1). If any court were to adopt the defendants' position that a trial judge must consider alternatives to excluding members of the general public from any unoccupied reserved seat in the courtroom, it would result in a wholesale reversal or rejection of decades of Supreme Court and lower federal court precedent on the meaning of "closure" of a trial. It would also expand the scope of the Sixth Amendment right to a public trial far beyond any existing federal court holding. It is one thing for a party to argue a novel question, but another thing entirely to stretch a constitutional provision so far beyond its scope under existing precedent. To find a "substantial" or a "fairly debatable" question on this record would entice defendants in the future to do a legal "reach for the stars" on the theory that the more extreme the argument, the greater their claim that it is "novel," thus warranting release pending appeal. The defendants here are not entitled to release pending appeal under 18 U.S.C. § 3143(b)(1) based on their novel, but unsupported and overreaching arguments about the scope of the

---

**9.** The defendants' assertion that a trial judge has an obligation to consider alternatives to denying the public access to any particular seat in the gallery, even on a seat-by-seat basis, in the absence of a "closure" of the courtroom, would turn the trial judge into an usher or, at least, require the trial judge to devote undue attention to managing the gallery rather than managing the trial. Surely neither the Sixth Amendment right to a public trial nor *Presley* requires such an absurd reallocation of the trial judge's energies.

Sixth Amendment right to a public trial and the meaning of *Presley.*

THEREFORE, the defendants' March 2, 2010, Joint Renewed Motion For Release Pending Appeal (docket no. 384) is **denied.**

**IT IS SO ORDERED.**